May it please the Court, Daniel Aguilar for the Federal Defendants. These rules are part of a decade-long project to reform the country's export regulations for weapons and defense articles. Here the State Department transferred export control over firearms, .50 calibers and under, semi-automatic and non-automatic, to the Commerce Department. And nobody disputes that State had the authority to conduct that transfer, that that portion of the rule is reasonable. The dispute here is limited to the concurrent transfer of regulatory authority over the export for technical data related to those firearms. The rules explain why that transfer was reasonable and appropriate, and that export of that technical data, specifically 3D printing files for the firearms at issue, is appropriate and can be controlled by Commerce. But fundamentally... It was sort of looked at some of the problems with the Department of Commerce rule, and then brought that back into the Department of State rule. And my question is, to what degree can't, when there's a rule, I haven't seen, I've done a lot of administrative law, I haven't seen a lot of concurrent rules that are done this way, but where it is done concurrently, to what degree can you consider what the Department of Commerce ultimately did when you're reviewing the Department of State rule? And the reason I ask is, the Department of State rule did seem to be predicated upon what the Department of Commerce planned to do. So if the Department of Commerce, for example, had said, well, we've changed our mind in the final rule, and we're just not going to regulate anything at all, would you then be able to consider that, as a judge, could we consider that as a court for purposes of reviewing the Department of State rule? So the political branches, the executive branch in Congress, could certainly review that kind of a determination and determine what kind of an export control would be appropriate. But as we explained in the briefs, the statutory bars on APA review for the Commerce rule and judicial review for the State rule prohibit APA actions of this kind to sort of allege, either by directly attacking the Commerce rule or by attacking the State and Commerce rule in combined, that this action was arbitrary and capricious, or somehow otherwise failed the APA. Okay, so I just want to be clear. So that's based on your assumption and your argument that the Department of State rule is also not reviewable, right? I would agree with you if we found that the Department of State rule was not reviewable, and we found that the Department of Commerce rule was not reviewable. I don't want to jump ahead, but I mean, it seems like everybody sort of agrees, or at least the district court agreed. I shouldn't say everybody. I don't want to put your opposing counsel in that box, but the Department of Commerce rule was not reviewable. But if we support the district court's position that the Department of State rule is reviewable, isn't there some point at which we could look at the Department of Commerce rule for purposes of determining whether the Department of State rule were reasonable? Or we would still be barred in all circumstances? So I'm going to give you some answers and suggestions. First, you correctly characterized our position. Second, I take it you're saying, assume that we reject the argument and we think that some amount of review of the State Department rule is permissible. I still don't know how you would have the textual basis, given the pretty broad language that's in 50 U.S.C. 4821, that just the Commerce rule is not subject to the APA at all, to say like, well, the way that the State Department somehow interpreted or applied or consulted with Commerce Department, because Commerce Department's rule is, you know, fundamentally inadequate in some way under the APA, nevertheless, we can assign that to State. I don't think that follows. But we'll be going to go ahead. Sorry. Even if you were to do that, I think I can jump to the merits on this and explain why the rules here nevertheless satisfy the APA. OK, Judge Whaley, I think that a question. If you if you conclude that Department of State's rule can be looked at, but the Department of Commerce cannot, wouldn't you conclude if you didn't look at the Department of Commerce rule that the State Department had found CAD files to be highly dangerous and had to be regulated and suddenly just decided not to regulate them? And the only way you can judge whether or not not regulated them makes sense is what substituted to prevent the harm that existed previously. So I don't know if we were to adopt your argument that we can't look at what the Department of Commerce is doing, then we have no action except the delisting of a highly dangerous weapon that was at least, according to the Department of State, was so a month before. So it seems like you have to look at the Department of State to even have some way. I mean, excuse me, the Department of Commerce to have some way to determine whether the action by the Department of State met its concerns about this weapon at the time that it had discussed it before the rule change. Again, I'm just relying on the text of the rule. But I think the reason why your honors are having questions on this issue is because this is a pretty novel challenge that we haven't seen before, right? An APA challenge against the transfer of regulatory authority from state to commerce, that the courts of appeals have pretty regularly said that this kind of decision, whether it's listed on the munitions list or on the commerce control list, just isn't usually subject to judicial review. This is something that is- Well, hold on. What they've generally said is whether it's listed on the munitions, when you list something on the munitions list, that's not subject to judicial review. The statute does not say when it's taken off the munitions list that that's also not subject to judicial review. So perhaps it's best if I address that concern initially because I think that's where a lot of the arguments on plaintiff's side originate from. So if you look at 2778, it speaks to the designation by the president of items as defense articles shall not be subject to judicial review. So the designation authority in subsection A is pretty broad, right? And the reason that we know that that authority includes the authority to both place items on the list and to remove them from the list is because Congress understood it to work that way, the executive branch determined it to work that way, and plaintiff's arguments against the rule necessarily understand it to work that way as well. So if I could just sort of each of those in turn, because I think it helps to understand what the designation authority does here. So the designation of the removal authority in subsection F, that was only added to the statute by Congress in 1981. Prior to that, the executive branch had always come out with a list that would both add and remove items from the munitions list. If you look at the regulatory citations we have on our reply brief, page 7, note 3, we list a couple of amendments to the munitions list, 1970 and 1971, well before there was any language in the statute about removal, yet those rules remove particular items from the list, not because it particularly said, oh, you know, we're going to take these off, but just depromulgated a new list. And then down in the end, in effective data, it said, by the way, to let you know, we can move these items for your convenience. And that's historically been the way that this acted. If you look to President Truman- But wait, just so I'm clear, that was before there was the judicial review taking away any judicial review for additions, correct? Yes and no. If I could just quickly explain. Even before there was the judicial review bar in H, the courts of appeals had consistently understood these sorts of determinations, the designation to the munitions list to not be judicially reviewable. And they described that usually in terms of the political question doctrine. When Congress then enacted the judicial review bar in 1989, we cited some of this legislative history. And Senator Kerry explained, this is just an act to recodify the existing law. And that law, as the 11th Circuit explained in the United States v. Martinez, was that whatever items are on the munitions list is not judicially reviewable. We know that there's this new statutory amendment precluding judicial review. We don't even need to decide whether that applies because it doesn't change the law. The law is just still the same. And if you look to plaintiffs' arguments for their reason why they think this is arbitrary and capricious, right? One of their claims is that, well, we don't think that the agency's considered the relevant statutory factors of world peace, national security, foreign affairs. Those are statutory factors in subsection A, which only talks about the designation authority. So, necessarily, plaintiffs think that if you're considering those statutory factors when removing an item from the list, what you're really doing is you're using your designation power. You're saying, these are the items designated and not designated as defense articles. And that's something that Congress, instead of providing for judicial review, has said, instead, we're going to have a reticulated scheme whereby if an item's removed, the president has to tell us about it. We will consult with the executive branches. And as Congress did here, considered whether to pass legislation that would prevent that or modify it or change it in any respect. And it was through those consultations, and in addition to the public comment, whereby people raised concerns about, well, is the Commerce Department rule really going to control all of these experts? And as we explained, yes, it does. There is no question that the Commerce Department rule controls the export of these firearms, of schematics, technical data, et cetera, assorted with them. That's true if you give somebody a USB stick with these three printed files on it, whether you send them an email, whether you give them to a foreign person in the United States. The difference between the previous Commerce Department rule and the State Department's rule was that both recognized that information in the public domain usually isn't regulated. Things that are at libraries or university textbooks. This Commerce Department rule also said, by the way, if it's publicly available on the Internet, we usually don't regulate that. There were then many concerns raised that, well, these files could be posted on the Internet. So State and Commerce consulted with Department of Defense, Congress, and others and said, okay, what we will do is we will reform our definition of public domain. What we will say is these 3D printing files for these firearms don't qualify as being in the public domain if they're put on the Internet. And if you publicly post it to the Internet, you need a license. And if you don't obtain one, there are going to be serious civil and criminal consequences to that action. You need to comply with the Reform Act and our rules under it. And that's entirely- That was the final rule of the Department of Commerce, you said? Yes, Your Honor. And that's an entirely reasonable way to- Well, what's interesting to me about that, and maybe you can weigh in on it because I want to ask your opposing counsel the same question. The logical- I mean, they raise it and say that's a logical outgrowth problem. But to me, what Commerce did was actually provided more regulation, which should have been more in line with what the states wanted. So I guess I'm wondering how they're harmed by that logical outgrowth problem because they're advocating for apparently more regulation. And when Department of Commerce gave more regulation to 3D guns in the final rule than the proposed rule, I'm trying to figure out where the harm is. And that might be the answer to my initial question. And I'd like to get you to weigh in on that. If we said the Department of State rule is reviewable, would the position be we can reach back into the Department of Commerce rule if they gave less regulation than what they proposed, but where they gave more regulation than what was proposed, there's no reason to reach back into the Department of Commerce rule because everyone presumably got more of what they wanted here. I would generally agree with that. The agencies who were responding to comments that they received, we didn't have an administrative record when this case was appealed because it was on a preliminary injunction, right? But if you just went to regulations.gov, you'd see that there are about 933 comments that the State Department received about concerns about 3D printed guns and the transfer of that export regulation to Commerce. So they were responding to that. But that was filed, just a second, those 933 were filed during the notice and comment period? Yes. There was also a bunch that was filed after the notice and comment period. That is true. There were more filed after, but those were- Can you address that were filed after the notice and comment period? Because my impression was it was a huge volume, but something like 105,000 out of 106,000 came on the same day from one website. Is that accurate? I'm not certain if that's accurate, Your Honor. Of the ones that were filed during the comment period, many of them were forum comments that sort of represented the same concern about, we don't think that this transfer is going to adequately ensure the continued export regulation of 3D printed firearms. And Congress asserted that concern as well, and that's exactly what the agencies responded to. And they responded to it affirmatively by changing the rules to make sure that this kind of information cannot be publicly posted on the internet without a license. Mr. Aguilar? Yes, Your Honor. Let me ask you something. It seems to me that you can infer from the record that the reason you got 106,000 comments was because the settlement that had been reached to resolve the litigation became public, and suddenly people realized that the position that was taken by the State Department that these weapons were a risk to national security and terrorism had been changed. Can you explain why, although you negotiated that settlement after you'd won the litigation in the district court and had a motion to dismiss pending, was not revealed until after the comment period was over? Because at least looking at the record, it looks like your change to the State Department rule was motivated by the settlement that was reached in the litigation, which you'd already won. And so looking at the record, when you published your rule change, which was not to regulate them anymore, would not lead someone to conclude that suddenly you had changed your policy to such an extent that you weren't going to regulate these products anymore. And I don't know why that wasn't disclosed before the comment period was over when the settlement was reached before. Well, Your Honor, I'm not exactly sure what the particulars for the settlement agreement were. I wasn't personally involved in that, so I can't speak to that. What I can speak to is what the proposed rules said. And what the proposed rules for states said is that we're going to transfer this authority over the export of these firearms to commerce. And the commerce proposed rule at, you know, 83 Fed Reg 24167 says we're going to exercise export control over these firearms and their technical data. But please note, software and technology, and there they gave the example of an operations and users manual for a firearm that's posted to the Internet, is not going to be regulated under our existing rules. And people responded to that assertion, and then Commerce Department changed its rules to ensure that that kind of public posting for these 3D printed files would continue to be regulated. But again, I'd just like to note, this is all just showing that on the merits their claim fails. But again, for the reasons I explained, the commerce rule clearly under 50 U.S.C. 4821 isn't subject to the APA. So any notice and comment or logical outgrowth challenges of that don't apply. For similar reasons, the state rule, even if you think that it might be judicially reviewable, isn't subject to the notice and comment requirements of 5 U.S.C. 553. And that's because... I have another question. It's hard to do this without interrupting somebody, and I apologize. No, no. Yes, Your Honor. But Judge Nelson had a question that I'm trying to see where it goes about whether the CAD files were more regulated when they went in the hands of the Department of Commerce than they were when they were regulated by the Department of State. At least my understanding is, up until the rule is changed, and it is no longer regulated by the Department of State, that the files were much, much heavierly regulated under the Department of State than they ultimately were under the Department of Commerce. Can you help me with that? I'm sure the plaintiff will help me, but at least in reading the briefing, it seems like there were a number of restrictions, licensing, registration, being able to submit these things by mail, as long as you avoided the Internet, were all prohibited, I mean, required or prohibited before the State Department stopped regulating them. So it wouldn't be that the Department of Commerce added more regulation. Their regulations ultimately were less than that which existed under the Department of State. Yes, Your Honor. The regulations are almost essentially the same. It covers the export of physical items. That's Commerce Rule 734.13A1 and A2 that says if you send an electronic file, if you send a physical item, if you give it to a foreign person in the U.S., that's an export and you need a license for it. And in the declarations for both the state and commerce officials, they explain this is governing the exact same type of firearms, their technical data, software, and technology. And just in terms of the potential penalties and enforcement of this, you need a license to post this kind of material on the Internet under the Commerce Department rule. And there's a particular concern from commerce's side, right? If this is publicly available, this kind of information could go to people in Cuba or Iran or North Korea. And I don't want to speak to any particular license application, but you could see why that would be a substantial difficulty before Commerce Department was willing to grant that kind of a license for putting it on the Internet. And as we know, in the last five years since the Reform Act was passed, Commerce Department, both in adjudicative proceedings and the United States in criminal enforcement proceedings, have vigorously enforced the Reform Act and commerce's implementing regulations. So the United States is committed to enforcing Commerce Department's rule and ensuring that this kind of information is not publicly posted on the Internet without a license. And if I could, I'd like to reserve the remaining time for that. Yeah. And we'll see. We may be able to give you a little bit more time. Mr. Selby? Thank you, Your Honors. Good morning, and may it please the Court. My name is Brennan Selby. I'm an Assistant Attorney General representing Washington and 21 plaintiff states as well as the District of Columbia. Your Honors, this case is about whether the State Department should be permitted to open Pandora's box with respect to undetectable and untraceable 3D-printed firearm technology. The dangers posed by these guns is undisputed. They can be used for political assassinations and hijackings. They can be brought through areas with metal detectors, such as airports, stadiums, and even courthouses. And this is a fact that the State Department itself recognized from 2015 up until it signed a settlement agreement in secret with Defense Distributed. I'd like to start by addressing Judge Nelson's question about how the states are harmed by the transfer jurisdiction, and in particular by the Commerce Department language in the publication. Well, can I be more specific? I do want to hear that. That's not the question I asked before, but it's a good question and one that I'd like to hear. My specific question was not whether the Department of Commerce regulation gives the same protection as the Department of State regulation, but does the final Department of Regulation, excuse me, the final regulation from the Department of Commerce give more protections than the proposed rule initially from the Department of Commerce? And if it does give more protections, why are you harmed through a logical outgrowth? Or maybe you're harmed in a different way. Go ahead. Yeah. Thank you, Your Honor. The short answer to that is the agencies certainly believe that the final rule provides more protection. I think the states wouldn't dispute that it doesn't provide less protection, but it really provides no protection for reasons I'll explain in a moment. Compared to the proposed rule you're talking about. Yes, compared to the proposed rule, which because of the publication exception would also have allowed unlimited dissemination. And that's why even if the Commerce Department had not added 734.7c, these rules would still be invalid because there was not notice of the particular effects on 3D printed firearms. So I think that's the direct answer to your question. I want to just back up and discuss why this does create harm to the states. And I think that these are technical details that the agencies are loathe to go into. But it's important to understand that there's two different types of files at issue here. There's computer-assisted manufacturing files, which are the files that we believe are ready for insertion into a 3D printer, which actually provide the directions to the machine tools to print the weapon. And there's computer-aided design files, or CAD files, which are the blueprints or plans that were formerly considered to be technical data under the International Traffic and Arms Regulations. It's clear from the State Department's and the Commerce Department's own statements that this language in 734.7 was intended to only maintain regulation over CAM files, manufacturing files, and not over CAD files. And they cite First Amendment concerns as one reason for that. The problem with this is that, as the states have demonstrated, including through declarations by some of the world's leading 3D printing experts, this distinction is illusory. The CAM files can be converted almost instantaneously into CAD files. And so it's like trying to regulate something, say that something can't be included in a Word file but could be included in a PDF file, when all you have to do is go in and click Save As and change the formatting. The regulation of CAM files only, of this Ready for Insertion files, is effectively deregulation. It will not regulate the files. But is that what the Commerce – I don't mean to interrupt, except I just want to make sure I'm following. I did not read the Department of Commerce rule, the final rule, as only regulating CAM files. I thought it was broader than that, and it was just anything published – files published online. No, because the rule states that it's only files that are, quote, ready for insertion into a 3D printer. And that language – again, this is a factual question that the district court considered – but that language is referring to files such as AMF or G-code, which are CAM files, but not CAD files, which would include many of the files that Defense Distributed was trying to release, such as files in a SketchUp format or a solid state or STL stereolithography. And so those we read as exempted. And it's important to note that because – I think the agencies have actually noted this. If you look at pages 17 and 18 of their reply brief, they point out the fact that they were concerned with First Amendment concerns, and I think they also mentioned that they had only intended to regulate the CAM files and not the CAD files. So this will amount to a deregulation. I'd like to – A deregulate – hold on. A deregulation from the original Department of State rule, not necessarily a deregulation from the proposed Commerce Rule. Because the proposed Commerce Rule wasn't going to regulate either of those, right? Yes, that's correct. The proposed Commerce Rule would have exempted everything. And the reason this is not a logical outgrowth is because the agencies made this sound like this rule change was going to affect commercially available weapons and weapons that are essentially available in retail outlets. I'd point the court to the excerpt of record, page 45, the declaration of State Department official Matthew Miller, as well as the state's notice at 83 Federal Register 24198 and the Commerce Notice at 24166. These describe the effect of the proposed rules as impacting essentially commercial items widely available in retail outlets. And so anyone who is reading this rule, which is embedded in a much – as everyone agrees, it's embedded in a much larger 10-year process involving jurisdiction of all firearms under – small-caliber firearms under .50 caliber – someone who is particularly interested in the unique dangers posed by 3D firearms, which really are novel and unprecedented, would not have read these rules and understood that these would have affected a deregulation. And that's why – Hold on a second. So your position is no one would have understood that, and yet we have 900 comments that actually were filed. I mean, do you agree with that number, that there were 900 comments that addressed 3D printing that were filed during the notice and comment period? I think our figures – and I would point to – and I'm sorry, I don't have the page number because my system crashed, but the supplemental excerpt of record, the declaration of Jenna Williams, which was an analysis of the comments – I think our numbers came to less than 500. But either way, whether you say it's 400 or 900 or 1300 was a number I'd heard somewhere, any of those would suggest that there were individuals who understood this was going to affect 3D printing. Yes, there were individuals who understood that this would affect 3D printing. I think the volume of the difference, as has been noted, 106,000 emails in opposition to this after the settlement was disclosed versus several hundred beforehand. Yeah, but can you address that for me? Because my understanding – am I correct that 105,000 of those came in on the same day from one website? I mean, this is not unusual to get a huge volume of form, you know, comments because somebody's trying to advocate it. I don't think the numbers are compelling. The question I have – in fact, I think the law is pretty clear that the numbers of comments have absolutely no material significance. The question is, were there additional substantive comments that were received that were not received prior? Can you point us to any substantive comment regarding 3D printing that was received after the notice and comment period that was not received during? All I can point to is – and again, I think the analysis of those comments was because there were so many and the agreement of the parties was done through a stipulation. I know, but my point is that the numbers don't mean anything because you don't – the agency doesn't have a responsibility to respond if they get 5,000 comments. The agency has a responsibility to respond and address the comment by substance. And so my question is, can you point me to anything in those 105,000 comments that were received during the notice and comment period? I can't at this point. I'm happy to look into that and if it would be helpful to your honors to – if that information  Well, I think what you're going to find – I'd be interested in it, but I think what you're going to find is no because 105,000 comments were somebody ginned up a lot of support and got a lot of people on their email list to send in comments, which is totally acceptable but doesn't have a legal bearing on whether people understood it before. Yeah, what I think it has a legal bearing on – and I just note that it cuts both ways this argument about the numbers. If it – you know, if the fact that there were some – Somebody got frustrated. That's for sure. Somebody got frustrated. Yeah. All I can say is what the states would have pointed out, which is if there had been some indication, for example, that the agencies were going to use First Amendment concerns as a basis for attempting to craft a rule that would affect the files, the defense distributed files, if there was some indication of that anywhere in the record, the states and other interested entities could have pointed out the technical defects in this that have now been pointed out. So we can say what the states would have pointed out, which is that based on expert analysis that we have conducted and from talking to national security experts, these files will be – because of the ease of conversion, the approach that was ultimately adopted by the agencies of just regulating the CAM files and not the CAD files is not going to work. So that's a very concrete type of comment that could have been pointed out by the states and by other entities. But why didn't the states point that out? I mean, 900 other individuals, interested parties, wrote comments on the 3D files. The proposed rule said, we're not going to regulate CAM files, we're not going to regulate CAD files either, I mean, effectively. Sorry, Your Honor. Well, 900 people understood that to be the case or some amount of them. And so now the states are coming in saying, well, wait a second, we would have weighed in if we'd known this difference. But what Commerce actually did was they expanded the regulation of these online products from the proposed rule to the final rule. So that's – I mean, you may not like how far they expanded it, but certainly there was no suggestion that they were going to be regulated at all under the proposed rule. Yes, Your Honor. I mean, at the outset, I would note that, you know, if we're going to say that numbers don't matter, then I don't – I think we'd have to say the 900 comments don't matter either or the 500 comments. Well, they matter for – they matter to this extent. Some number of people – and you're right, I don't know what those 900 are. I don't know if that's five different substantive comments or 100 substantive different comments. But some number of individuals, interested parties, understood that 3D files were at issue here. And I think that's the only thing. Whether it's one comment or 900 is a little bit less relevant. Yes. And the states have cited authority, at least from the federal circuit, to the extent that you can't bootstrap notice from comments, which I think is accurate. The test is – under National Resources Defense Council is that the rule must provide notice sufficient to fairly apprise interested persons of the subjects and issues before the agency. And what's more, the rule can't be sort of actively misleading, and I don't mean to suggest that the agencies were intending to mislead, but the way that this was described as affecting commercially available items and retail items was in such a manner that if someone was interested in the unique dangers of 3D firearms, such as the states, would not have seen this coming. And I think that that's the real problem here, is that the states did not have – frankly, we just didn't even know that this has affected it. I don't know – I can't speak for the individuals who did submit comments. Maybe they were deeply involved in this, you know, deep in the weeds on this information. Maybe – I have no idea. But what I do know is that as soon as the states and others were – you know, became aware of this, there was a massive outpouring of dissent to this action. And I think that's telling, and I think that states have identified specific comments and concerns that would have raised – which I think at least should have raised some questions for the agencies to consider specific to these technical details. Councilman, before it gets – the time gets away from you, would you turn to the question as to whether the – as to whether the State Department's rule is reviewable? Yes, Your Honor. The State Department's rule is reviewable, as – for the reasons essentially that Judge Nelson stated, that the State Department is predicated on what the Commerce Department did and incorporated that reasoning into its rule. And the State Department's reasoning is reviewable because there is no jurisdictional bar. And contrary to the government's assertion, the statute does distinguish between designation and removal. And the agency's attempts to broaden the definition of designation to include everything related to the munitions list at every stage of the process simply doesn't hold up. And it's very important to recognize that there is a strong presumption in favor of judicial review. I got the strong presumption. So as I understood government counsel, 2778F was added in 1981 and 2778H was added in 1989. Do you have – is that your understanding? That's our understanding, Your Honor. And did those – did the addition of those – of those sections alter the prior structure of this Act? Or did it – or did it just reify things that were already in place? What is the effect of the addition of those two sections? Yes, the additions altered the statute. The addition in 1981 added a congressional reporting requirement and also expressly added a removal authority. A congressional reporting requirement was not in the prior statute. And there's nothing in the APA that would have – you know, sort of as a general umbrella statute that would have required DOS to report to Congress on this. Okay. Does – what does this tell us about the difference between designating and non-designating as opposed to simply telling us that if you decide to de-designate something, then you be sure and tell us before you do that? Yes. What it tells us is that Congress distinguished between these two sites of actions and did not consider removal to be a form or a subspecies or the – you know, the language that the agencies are using to try and sweep this into it. And I think actually the legislative history that the agencies point to in support actually cuts against them. If you look at the House report language where it states that the additional notification procedures were consistent with past congressional actions to maintain prudent arms control while contemplating removal, something new, it demonstrates that – you know, this was only five years after the initial statute was passed. At some point, Congress realized we – you know, we're worried about over-regulation. We're worried about just endlessly adding things to this list. Does the – is there anything in the House report that suggests that under 2778A that the State Department had used that authority improperly as authority to de-designate? That is, that the State Department did not have the authority to de-designate weapons, only to designate them, and that 2778F was giving them the authority to de-designate weapons so long as they gave Congress the 30 days' notice? Well, I think the language in the House report while contemplating removal suggests that removal was not contemplated earlier. But another point – you know, this issue had not arisen – I thought they had been removing earlier. You know, I thought that the practice was to include both additions and removals. Yes, I think there are maybe two or three examples of completely non-controversial items. And these weren't stated as removals. It's important to note that these – the evidence they present is that there's a before and after picture, essentially, where one – they give one version that has bayonets on it, and then the next version doesn't have bayonets. It does appear to be a functional removal, but it's not something that Congress or anyone else would have been aware of. And so, if we're going to argue that that kind of post-enactment – Yeah, so, it's just that 2778F is kind of an unusual way of Congress granting the Department of State the authority to de-designate or to remove items off of the munitions list. I mean, it looks more like simply a congressional reporting requirement. Not too surprising. We have lots of these around. But it doesn't really look like it's saying, and by the way, Department of State, we're authorizing you now to remove these. But number one, you are going to tell us before you do it. And number two is what? We didn't say anything about APA. We just said you've got to do this 30 days before you do it. But if the APA kicks in, that suggests there's going to be a whole lot of more delay there. I mean, it's a very strange way of suggesting that the State Department would be subject to the APA for removal when years later they're going to tell the State Department they're going to codify the prior practice that the State Department was not subject to the APA with respect to the munitions list. A very strange way of doing, of accomplishing what you're telling us they accomplished. Yeah, I'm not sure it's all that strange. I do think that it's, you know, maybe was not considered, you know, I think that precise circumstances of removal were not considered or contemplated before. And so this they were expecting this to be the executive, I think, to be hesitant to remove. And so this was to urge, you know, to make clear that this authority exists. If this authority existed before, it would have existed as some sort of implicit authority and not as part of a designation as that term is used. The term designation needs to be interpreted narrowly. And it has been referred to as adding items to the statute in every instance. And in fact, the defense article is defined as an item that has been designated. And so it would be inconsistent to view an item that's designated as one that's actually been removed. I see that my my time has has expired. I mean, if you if you need to wrap up, we'll give you a minute. Thank you. And by the way, if there's more questions from the judges, feel free to ask them. I know it's hard. Well, I would like to follow up, counsel, by just asking you to address that 2778H. What what does that do? Is that is that new in the sense that or does it codify a prior practice? Does it codify the practice that the State Department had asserted these things were not reviewable? Or does 2778 say, oh, my goodness, all of this was reviewable before we've got to exempt them because we didn't do that in the first place? Yes. What are we supposed to read into the addition of 2778H? Yes. 2778H is new. I think to the extent there was a prior practice review, it was under the political question doctrine. And the one case that says that is the Martinez decision and stated that that was there was a thought that the addition of items to the munitions list was a political question. It's very easy to understand why that would be, because these are there could be weapons technology that is very time sensitive, that is suddenly about to be released or some new technology. You want to get on that list quickly. The removal question does not raise those types of concerns. And I would add that the agencies have also not pressed a political question argument on appeal. And so to the extent there was an issue with reviewability prior to 2778H, it was only under the political question doctrine, which the agencies have abandoned. It wasn't under some other jurisdiction stripping that was implicit, thought to be implicit within the statute. So for those reasons, we think that it's that subsection, at least, does not strip review over the removal decision. To wrap up quickly, if there are no other questions, because the State Department failed to provide notice of the jurisdictional transfer of 3D gun files, failed to acknowledge that the new rule allows for a complete deregulation through conversion to CAD files. And because its reversal of position remains unexplained, the states respectfully ask the court to affirm the judgment of the district court. Thank you, your honors. Thank you, counsel. Mr. Aguilar, we'll give you three minutes for rebuttal. Thank you, your honor. I guess I'd like to start with the removal and judicial review bars in 2778. So before there was the removal provision for notifying Congress in subsection F, and we explained this on page six of our reply brief, Congress had required reporting of when the executive was going to remove items from the munitions list. And plaintiff's counsel concedes that there is implicit authority to do that in the statute. That authority comes from the ability to designate items. The ability to designate means put on the list and take off the list. And if you look to the regulations we cite to in footnote three of our reply brief, which are before subsection F was ever enacted, those note that they've revoked entire categories of items from the munitions list and removed particular ones. For example, helium, I think, which was used in particular kinds of rockets, was no longer listed as a defense article. And that regulation notes that it's been removed. So the removal authority came from the authority to designate in the first place. So subsection F doesn't say, oh, all of a sudden this is a different kind of authority that we're granting you. That's always been there. And the judicial review bar in subsection H applies to State Department's rules in this area on what is on and what is not on the munitions list, because everybody would agree the decision not to have something on entirely would similarly be unreviewable. And to the notice comment that a plaintiff's counsel just raised, that the State Department's rule is somehow deficient because of notice, I note that, and we cite this on page 23 of a reply brief, State Department had an existing regulation back since the 1950s that designations and rules under the Control Act or under our authority to designate items to the list are not subject to notice and comment. And Public Law 94-329, Section 212B2 was Congress in the Control Act saying we are affirming everything that State Department has done under this authority, including the regulations it has promulgated. Congress affirmatively authorized and codified State Department's understanding that these rules are not subject to the notice and comment requirements of the APA. And just a plaintiff's counsel assertion here that the State Department and Congress department have taken a new position or that it's unexplained or that it's not been sufficiently regulated or essentially deregulated. I note that that position stands in stark contrast to plaintiff states filings before this court in the related case involving this defense distributed. There are the plaintiff states have said, quote, in short, the federal government's current policy is that the subject file should be export controlled, that they, quote, are subject to federal export controls and cannot be distributed without limitation and that the State and Commerce Department's decision to promulgate the final rules here, that that was a reflection of the department's, quote, independently choosing to promulgate new final regulations controlling these. And that's just a recognition that these do present concerns, that the federal government took those concerns to heart and modified the rules to ensure that these kind of files cannot be posted on the Internet without a license. Thank you, counsel. Thank you both, counsel. Exceptional job. Very much appreciated. And yet another complicated case. There's been three interesting back to back cases. And with that, we'll we'll go ahead and go into recess. So thank you. Thank you. Thank you. This court for this second stands adjourned.
judges: Bybee, Whaley, Nelson